Kass Harstad, Esq., Bar No. 11012
Strindberg & Scholnick, LLC
675 East 2100 South, Suite 350
Salt Lake City, UT 84106
801.359.4169 (tel)
801.359.4313 (fax)
kass@utahjobjustice.com

Rebecca Houlding, Esq.
*To Be Admitted Pro Hac Vice*
Law Offices of Joshua Friedman, PC
1050 Seven Oaks Lane
Mamaroneck, NY 10543
212.308.4338 (tel)
866.731.5553 (fax)
rebecca@joshuafriedmanesq.com

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ENRIQUE PASPUEL, and JULIO PASPUEL, <br><br> PLAINTIFFS, <br><br> v. <br><br> PRO STAR TRUCKING, LLC. <br><br> DEFENDANT. | **COMPLAINT and JURY DEMAND** <br><br><br> Civil No. <br> Judge: |

Plaintiffs Enrique and Julio Paspuel, by and through their undersigned counsel, hereby complain as follows:

### NATURE OF THE CLAIMS

1. This is a hostile work environment case of racial harassment and retaliation brought pursuant to 42 U.S.C. Sec. 1981 ("Sec. 1981"), and a hostile work environment case of national origin harassment and retaliation pursuant to 42 USC 2000e et seq. ("Title VII").

1

## PARTIES AND JURISDICTION

2. At all relevant times herein, Plaintiff Julio Paspuel worked as Driver for Defendant Pro Star Trucking, LLC. Julio Paspuel is a Latino male of Ecuadorian descent.

3. At all relevant times herein, Plaintiff Enrique Paspuel worked as Driver for Defendant Pro Star Trucking, LLC. Enrique Paspuel is a Latino male of Ecuadorian descent.

4. Defendant Pro Star Trucking LLC ("Pro Star") is a limited liability company with its primary place of business located at 1545 S. 4800 West, Salt Lake City, Utah. Pro Star specializes in hauling water.

5. Plaintiffs and Defendant had contractual relationships within the meaning of 42 U.S.C. Sec. 1981.

6. Defendant is an employer within the meaning of Title VII.

7. This Court has jurisdiction pursuant to 28 U.S.C. Sec. 1343. Venue is proper in this district pursuant to Title VII and the general venue statute, because the conduct complained of herein took place within the judicial district.

8. Enrique Paspuel filed a Charge of Discrimination with the Equal Employment Opportunity Commission. This Complaint is being filed within 90 days of Plaintiff Enrique Paspuel's receipt of a Notice of Right to Sue.

## FACTUAL ALLEGATIONS

9. Pro Star hired Enrique Paspuel as a driver and clerical worker in March 2011.

10. Pro Star hired Enrique's father, Julio Paspuel, shortly thereafter, and he began work as a truck driver in June 2011.

11. The Paspuels are Ecuadorian.

12. At the time they were hired, the Paspuels each had more than a decade of experience in the trucking industry. Together, the Paspuels helped to support Pro Star's water-hauling operations in

the Bakken formation in western North Dakota.

14. Throughout their employment, managers at all levels, from Pro Star's President, Mark Beck, to Senior Pusher/Supervisor, Daron Simkins, and Operations Manager and Plaintiffs' direct supervisor, Ed Dursteler, subjected the Paspuels on a frequent and regular basis to racially harassing language and conduct.

14. The Paspuel's co-worker, Logan Collett, explains in his sworn statement that:

> During my time at Pro Star, I heard Supervisors Steve [Munson], Robin [Schiele], Ed [Dursteler], Daron [Simkins], and Rowdy [Anderson], all refer to Julio and Enrique Paspuel as Mexicans in a negative manner. . . I heard racial slurs/comments towards Enrique and Julio up until they were no longer employed by Pro Star and even after they left.

Declaration of Logan Collett, dated October 20, 2013, Exhibit A, ¶ 3.

15. Indeed, it was common knowledge among Pro Star's drivers that management discriminated against the Paspuels because of their race. Collett Decl., ¶ 4.

16. Racist language permeated every level of the company, from the top down. Employees, along with Pro Star's President, Mark Beck, regularly made inappropriate (and false) comments about Enrique Paspuel's legal status in the country. For example, on September 10, 2011, Mr. Beck sent the following message to Enrique:



17. Despite the fact that Mr. Beck was the president of the company, Enrique told Mr. Beck directly that the frequent comments about green cards and being "illegal" were offensive and should be stopped. However, Mr. Beck continued to "joke" that the Paspuels were illegal immigrants.

18. Mr. Beck assumed the Paspuels were Mexican, because they had dark skin and could speak Spanish. During a phone conversation with the Paspuels and Mr. Dursteler, Mr. Beck stated, "we love having you Mexicans around," in reference to the fact that he believed the "Mexicans" would do Pro Star's worst jobs. Mr. Dursteler said that Enrique was "dumber than a dog," to which Mr. Beck replied, "if Ed's saying that, I'm going to stand by what he says."

19. Taking their cue from the President, supervisors made regular offensive statements as well:

> Supervisor Robin called Enrique and Julio stupid Mexicans; I said to Robin "you do know they're not Mexican". Robin replied "whatever, they're all the same thing". Supervisor Ed [Dursteler] responded by laughing.

4

(Collett Decl. ¶ 3).

20. In a sworn statement provided to the Utah Labor Commission, the Paspuels' coworker Robert Bjelland testified that on multiple occasions he heard Mr. Simkins and Mr. Schiele, both supervisors, call the Paspuels "fucking Mexicans," "damn Mexicans," "stupid Mexicans," and "lazy Mexicans." Bjelland Statement, dated April 12, 2012, Exhibit B.

21. The same supervisors also often complained that they could not understand what Julio was saying, even though Collett and other coworkers understood Julio clearly. (Collett Decl., ¶ 4). The North Dakota supervisors often made similar comments about not being able to understand Enrique and another Hispanic driver, Ricardo Balderas. Mr. Balderas speaks with a Texas accent, having been born and raised in Texas.

22. Although the supervisors openly shared their hostility towards those they perceived as "Mexicans," Supervisor Mr. Simkins, was particularly vocal.

23. Many of Mr. Simkin's comments were made directly to Julio and Enrique, including calling Plaintiffs "fucking Mexicans," and, over the CB radio, stating that the company should send the "damn Mexicans" to do the "shit work."

24. Another incident occurred while Mr. Simkins and Enrique were discussing proper technique for maintaining log books. Enrique had previously performed log book audits, while Mr. Simkins did not understand how to properly complete the logs. Enrique had been recognized by upper management for his capabilities with log books. Mr. Simkins snapped at Enrique, saying, "I don't like you and the rest of all you damn Mexicans taking over my work."

25. After drivers began approaching Enrique for help with their log books, Mr. Simkins' comments intensified. Simkins told Enrique, "I really have a problem with you damn Mexicans," and made multiple comments that Enrique was "trying to take over [his] job."

26. When Enrique refused to drive in violation of the DOT rules, Mr. Simkins told him, "why don't you go back to your country and leave us alone."

27. On another occasion, Mr. Simkins stated that he felt bad his friend had to work with "these Mexicans." Mr. Simkins stated that he would quit if Enrique and Julio were allowed to keep working for Pro Star.

28. The Paspuels' first-level supervisor, Mr. Dursteler, also openly expressed his anger towards Hispanic employees.

29. Mr. Dursteler referred to "fucking Latinos" and "fucking Mexican people," which Julio heard on multiple occasions.

30. When Enrique refused to drive over the number of hours he was permitted/approved to work, Mr. Dursteler became very upset, telling Enrique, "who in the hell do you think you are, you damn Mexican."

31. In a different conversation between Enrique and Mr. Dursteler, Mr. Dursteler said, without prompting, "Yes I am a damn racist, do you have a problem with that?"

32. Mr. Dursteler generally treated the Paspuels in an abusive manner and with an aggressive demeanor. For example, following an incident in January 2012 in which the tires had blown out on Julio's trailer, Mr. Dursteler screamed at the Paspuels, calling them "you fuckers" and aggressively stating, "what the fuck do you think you're doing" and "who in the fuck told you to do this?" In fact, Mr. Dursteler physically grabbed Enrique, who was sitting in a truck, and dragged him out of the vehicle to yell at him. While Enrique and Julio were still present, Mr. Dursteler placed a call to Mr. Beck on speaker phone. With the president of the company listening, Mr. Dursteler said to Enrique, "you stupid son of a bitch, a damn fucking dog is smarter than you because when you kick it stops barking, but you keep fucking coming back for more. I am God here and you do what I say."

33. Dursteler did not treat similarly situated Caucasian employees in the same abusive

manner.

34. In addition to the verbal hostility and insulting racial comments, Hispanic employees also received worse job assignments than their Caucasian peers. For example, Caucasian employees were typically given the more desirable day shift, while Hispanic employees were forced to drive at night.

35. Additionally, while Caucasian drivers were given new trailers to drive, the Paspuels were forced to perform their jobs with old, often unsafe equipment. The trailer that Julio was assigned had numerous mechanical problems. Out of concern for his safety, Julio had the truck and trailer inspected by a mechanic in North Dakota, who told him that the trailer was not safe for travel in that state. Ultimately, the vehicle required thousands of dollars in repair costs just to be functional to drive.

36. Management also made sure to assign undesirable non-driving tasks to the Paspuels. One winter, several Caucasian drivers decided to put mud tires on their trucks. Even though Julio and Enrique had decided not to put mud tires on their own trucks, they were still required to change the tires for the Caucasian drivers. The Paspuels were often assigned to similar dirty jobs, many of which took place outdoors during the North Dakota winter.

37. In addition to giving the Paspuels more onerous work assignments, Julio and Enrique's supervisors also tried to make their jobs undesirable in other ways. In his sworn declaration, Logan Collett recalled that the North Dakota supervisors would team Julio and Enrique up with coworkers who did not like them, in an effort to make their working situation more uncomfortable. Collett Decl. ¶ 4.

38. Throughout their time working for Pro Star, Enrique and Julio repeatedly opposed the racial harassment. However, the Paspuel's complaints about racial harassment were met with indifference and, at times, punishment.

39. In June or July 2011, Enrique complained to Mr. Beck regarding Mr. Beck's offensive

7

jokes that Enrique was "illegal," and about the offensive comments that Mr. Dursteler and Mr. Simkins had been making. Enrique informed Mr. Beck that if the conduct continued, he would file a complaint with the Utah Labor Commission. The racial harassment continued.

40. In November 2011, Enrique and Julio separately attempted to put an end to the racial harassment. Around Thanksgiving, Julio approached Mr. Dursteler to have a conversation about the racist comments Julio had been hearing about his son. Julio asked Mr. Dursteler why he was insulting Enrique, and asked him to stop.

41. That same month, Enrique had also attempted to address the racial harassment in the workplace. Enrique informed Mr. Dursteler that Mr. Simkins was not treating him like a normal person and complained that Mr. Simkins would often pretend he could not understand what Enrique was saying. Indeed, as Enrique explained, Mr. Simkins would often simply turn his back on Enrique during their conversations.

42. Mr. Dursteler arranged a meeting between Mr. Simkins and Enrique, during which Enrique told Mr. Simkins that he did not know why Mr. Simkins did not like him. Mr. Simkins became angry and began ranting, stating, "I have a really big problem with you Mexicans taking over our jobs."

43. Following the meeting, Mr. Dursteler said that he would be writing up not only Mr. Simkins, but Enrique as well, because he [Enrique] must be responsible if he and Mr. Simkins were not getting along.

44. Although Mr. Dursteler said that both Mr. Simkins and Enrique would receive a write-up, Mr. Dursteler never put one in Mr. Simkins' file.

45. Julio complained again to Mr. Beck later in 2011. However, Mr. Beck responded that he "didn't want to know anything" about it.

46. On January 3, 2012, Enrique complained again to Mr. Beck about the racially harassing comments and the unfavorable treatment he received in comparison to his Caucasian coworkers.

Following the complaint, Pro Star cut Enrique's pay rate and stopped giving hours to him and Julio.

47. Later in January 2012, Julio attempted to talk to Mr. Beck about the harassing behavior of the supervisors in North Dakota but Mr. Beck cut Julio off saying, "No. What happened, happened."

48. When the racial harassment did not stop, Julio and Enrique arranged a meeting with Human Resources Specialist Steve Munson in Pro Star's Utah offices. Julio and Enrique described the racial harassment. Mr. Munson assured Julio and Enrique that he would look into the matter, but the racial harassment continued, and the Paspuels were punished.

49. Employees who did not go along with Mr. Dursteler and Mr. Simkin's "crud. . . didn't go anywhere with the company." Bjelland Statement. That pattern repeated itself when Enrique and Julio were both terminated.

50. Within weeks of complaining to Mr. Munson, Julio was placed on probation allegedly for driving with unsafe tires.

51. Mr. Collett observed the North Dakota supervisors speaking to each other about possible excuses to terminate Julio. In his declaration, Mr. Collett explains:

> While dropping paperwork off one day at the company 5th wheel office, I heard Supervisors Ed, Dave, Daron, and Fred trying to recall everything Julio had done wrong while on the job, speculating past situations that would result in Julio being terminated.

(Collett Decl. ¶ 4).

**52.** In early February 2012, Pro Star stopped giving Julio work before officially terminating his employment at the end of the month.

**53.** On the same day Pro Star terminated Julio, it also discharged one of Pro Star's only other Hispanic employees, Ricardo Balderas.

**54.** A few months later, Pro Star drastically reduced Enrique's pay. In May and June 2012, Pro Star unilaterally changed Enrique's payment arrangement from an hourly rate to a salaried basis. Pro Star made the change in Enrique's pay structure at a time of year when he had accrued substantial

overtime hours. Indeed, under the yearly salary arrangement, Enrique's earnings would drop by more than $20,000 compared to 2011.

**55.** On July 6, 2012, Pro Star assigned Enrique to drive in North Dakota for one week, which Enrique agreed to extend by an additional week in spite of his upcoming, approved vacation later that month.

**56.** On July 23, 2012, Enrique called Pro Star's General Counsel, Casey Adams, because the two weeks had finished, and he needed to return to Utah to catch his flight to Europe. During that conversation, Mr. Adams expressly approved Enrique to return to Utah on July 25th.

**57.** However, the following day Adams reversed course and told Enrique he could no longer leave on the 25th but would, instead, have to drive later that week. Enrique explained that he was going to be on his 34-hour reset period and by the time he would be able to drive, he would already need to be back in Utah to begin his trip, which the company had approved well in advance. Adams told Enrique to drive before his 34-hour reset period was up, and if he would not, he was terminated. Adams then said he would "consider it [his] resignation." Enrique explained to Adams he was not quitting but would not drive during his reset period.

**58.** The following day, Defendant terminated Enrique's employment.

**59.** Plaintiffs have experienced economic loss and emotional distress as a result of Defendant's conduct.

<u>**Count One**</u>
<u>**Julio and Enrique Paspuel v. Pro Star Trucking, LLC**</u>

<u>**Hostile Work Environment**</u>
<u>**in violation of 42 U.S.C. 1981**</u>

**60.** Plaintiffs incorporate by reference paragraphs 1 through 59.

**61.** Defendant engaged in intentional discrimination by creating a hostile work environment on the basis of race.

**62.** Defendant allowed the hostile environment to exist despite notice.

**63.** As a consequence of Defendant's actions, Plaintiffs suffered severe emotional distress.

**64.** Defendant's actions proximately caused Plaintiffs' injuries.

### Count Two
### Julio and Enrique Paspuel v. Pro Star Trucking, LLC

### Retaliation
### in violation of 42 U.S.C. 1981

**65.** Plaintiff incorporates by reference paragraphs 1 through 64.

**66.** Defendant engaged in illegal retaliation by, inter alia, terminating Plaintiffs' employment in retaliation for complaints of harassment.

**67.** As a consequence of Defendant's actions, Plaintiffs suffered severe emotional distress.

**68.** Defendant's actions proximately caused Plaintiffs' injuries.

### Count Three
### Enrique Paspuel v. Pro Star Trucking LLC

### Hostile Work Environment
### in violation of 42 U.S.C. 2000e (Title VII)

69. Plaintiff Enrique Paspuel incorporates by reference paragraphs 1 through 68.

70. Defendant engaged in intentional discrimination by creating a hostile work environment on the basis of national origin.

71. Defendant allowed the hostile environment to exist despite notice.

72. As a consequence of Defendant's actions, Plaintiff suffered severe emotional distress.

73. Defendant's actions proximately caused Plaintiff's injuries.

### Count IV
### Enrique Paspuel v. Pro Star Trucking LLC

### Retaliation
### in violation of 42 U.S.C. 2000 (Title VII)

74. Plaintiff incorporates by reference paragraphs 1 through 73.

75. Defendant engaged in illegal retaliation by, inter alia, terminating Plaintiff's employment in retaliation for his complaints of harassment.

76. As a consequence of Defendant's actions, Plaintiff suffered severe emotional distress.

77. Defendant's actions proximately caused Plaintiff's injuries.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request:

a. Judgment against Defendant for violations of 42 U.S.C. 1981 and 42 U.S.C. 2000E;

b. Compensatory damages for emotional distress;

c. Damages in the form of lost wages;

d. Punitive damages;

e. An award of prejudgment interest;

f. All costs and attorneys' fees incurred prosecuting these claims; and

g. Such further relief as the Court deems just and equitable.

Dated: December 15, 2014

        Respectfully Submitted,

        Strindberg & Scholnick, LLC

        By: _____/S/_____
          Kass Harstad, Esq.
        675 East 2100 South, Suite 350
        Salt Lake City, UT 84106
        801.359.4169 (tel)/ 801.359.4313 (fax)
        kass@utahjobjustice.com

        Law Offices of Joshua Friedman

        By: /s/ Rebecca Houlding
          Rebecca Houlding
        1050 Seven Oaks Lane

Mamaroneck, NY 10549
Tel (212) 308-4338 x 5/ Fax (866) 731-5553